Good morning, Your Honors. May it please the Court, Eric Schreiber on behalf of Plaintiff and Appellant Kauai Scuba Center. I would like to reserve three minutes for rebuttal if acceptable. Under California law, in order to state damages to survive a pleading type motion, Plaintiff need only allege that based upon a misrepresentation, he or she would either not have purchased something or what he or she purchased is worth less value. Well, Counsel, I guess the problem I have is the question of standing. What injury has your client suffered that was not covered by the insurance policy? The fact that he overpaid premiums. So it's just that? He's not here before us because he didn't get enough to compensate him for the property damage that was paid under the policy? Correct, Your Honor. This case is about deception and about... What evidence do we have in the record to show that he would have paid a lower premium than the one that he paid? Well, he alleged that what he received was not what was promised. For example, in the Kwikset case, something is alleged to have been made in the USA, and in fact it wasn't. Well, can I ask a question about that? I understand the allegations that have been made, but if your client, as I understand it, was required as a condition of certification to get insurance, correct? Insurance, yes. Okay. And is there any allegation that there is... or any... if the allegation is simply that this was worth less, and therefore the premium was an overpayment, does there need to be any kind of allegation that your client had available in the marketplace another insurance policy that did not have any self-insured retention feature that would have been available at a price that reflected the absence of the self-insured retention in the one type of the insurance that your client purchased? Because I understand that for the other category, the CGL policies, there was no self-insured retention feature, correct? Your Honor, I don't believe a specific allegation that there were other products on the marketplace is a necessary requirement to state damages. Well, I'm trying to understand how your client is harmed if what your client got gave your client the coverage described, and if there was... what it did was make Patty, not your It wasn't a requirement that your client pay the self-insured retention, correct? Right. It was the requirement that Patty pay it. There's no allegation that Patty was unable to pay it. There was some speculation that there wasn't any regulation that would require your client to have the reserves in the same way that Lexington, which is a surplus lines insurer, might be required to have the reserves. And is that the theory of the case? Maybe I can answer a question with an example. If I were to walk into an insurance agency and I was told, I'm going to get you an A plus coverage with a rated insurance company, I might say, great. I feel comfortable about that. I'm willing to pay X dollars for that. On the other hand, had I been told, you know, we're going to get you a policy and it's not really backed by an insurance company and 99% of the claims that might occur... Well, as to that, there is a factual dispute, which I must say that when I read this agreement and not even knowing about the factual dispute, I said, this is an aggregated $300,000. It's not $300,000 per claim. It says that. And you're assuming it's $300,000 per claim. Regardless of whether it is or it isn't, the fact of the matter is, is the person on the front lines is Patty. And had my client been told that... $300,000 for how many hundreds of dealers are we talking about? I don't know the exact number. But a lot. This is annual aggregated, right? Yes. It's not that much money. I understand that. But the fact of the matter is, if someone tells me, there's not going to be an insurance company on the front lines, I might say, I don't want that at all. I'm going to go elsewhere. Or I might say, I'm not willing to pay the price. Or you might say, this is a pretty good deal because I don't have to pay the deductible. They will. Right. Because it seems to me that the replacement insurance that your client is asking for would have to be a policy in which he would agree to a self-insured retention of $300,000. And I'm guessing that he would not get as favorable a premium rate as he got by obtaining it through Patty. Correct. But what if he just simply obtained a standard insurance policy? Without a deductible? $500,000, $1,000, a standard type of deductible. With the same amount of coverage? For a scuba shop. For a scuba shop. Required, and this would be insurance that would have been required as a condition of certification? Yes. But, but How many people provide that kind of insurance? That I don't know, Your Honor. But the fact of the matter is, is there was no disclosure. Another question is, and perhaps this is better directed to your opponents, but exactly how did this work? The record seems to say it was, the $300,000 was, quote, funded. And my understanding is that it wasn't Patty who actually cut the check. So how did it work? My understanding of the situation is as follows. Patty had a master policy with Lexington. That policy had a $300,000 deductible. Therefore, Patty was responsible for the first $300,000 of claims. But it was funded. It funded it. What does that mean? That I'm not sure, Your Honor. And it didn't cut the check, right? No. The check was an exchange by York. If your claim is essentially a failure to disclose claim, then who among the defendants that you have sued could arguably have a duty to disclose at all? Would it be Lexington? Well, without question, the broker, Lucentian Buckley is the subject. Would Lexington be at all exposed on this theory? If Lexington purposefully lends its name to this policy, given an error of legitimacy, making people believe Lexington is going to be covering me when they know, in fact, it generally is not. But the named insured here is Patty, correct? Yes. That's Lexington's customer, right? Yes. Does Lexington know all of the additional insureds and all of the details of the communications between the insurance brokers and those insureds? I honestly don't know the arrangement. Where would the duty to disclose be on Lexington? I believe the general theory, Your Honor, is California's civil conspiracy law, which states that if a group of parties conspire, each one is liable under the theory of conspiracy for the torts of another. Also, again, if Lexington knows that this is going on, if Lexington says, well, you know, Patty, obviously you've got this master policy. And, you know, given your master policy, you know that all these dive shops are going to be... Let me ask another question. Does the record reflect whether your client ever got a copy of the policy? Your Honor, I do not believe it does. I believe... If they did, then what was being undisclosed? It's in there. The advertisement certainly doesn't say. I believe it was alleged that we were not provided with a copy of the master policy. The broker never... What did the broker issue, just a certificate of insurance? I believe so. Again, I could look at the pleading and give Your Honors a more thorough answer. That would be a good idea, since you're up here arguing. It would be nice if you knew the record, especially because the record's about that big. I mean, at least ask the question of what was alleged. Unless the Court has any further questions. Well, just one, you're alleging that had Patty been an insurer, then it would need to set aside appropriate reserves. Would the reserves equal or exceed $300,000, given the nature of the contract? With Lexington? It should. It should? Why? Well, if Patty's assuming... The policy kicks in after the $300,000. Right. It's exhausted. It would be Patty's responsibility to cover $300,000. But it appears to me from... But it's vague in the record that there was some reserves, essentially, that they paid this money in advance to somebody. I don't... To whom? I... You don't know. And the allegations and the pleadings, as I recall them, focused on this theory that not so much of disclosure, but of this theory of misrepresentation, that is, Kauai had received unlicensed insurance when it paid for licensed insurance, but the District Court, it seems to me, found that there was no unlicensed insurance anywhere in sight, as a matter of law, and that's what the allegations were. So I guess my question is, if you are now asserting, essentially, a failure-to-disclose claim, how does that relate to the unlicensed versus licensed misrepresentation claim that you asserted in your pleadings? I believe they go hand-in-hand, Your Honor. The fact of the matter is, Kauai Scuba is saying, it was not disclosed to me that there was an unlicensed dive company on the front lines of its insurance policy. Unlicensed... Unlicensed... But if it's not an unlicensed insurer, which is what your argument and allegations were, then there is no misrepresentation by omission or otherwise. To the extent the true nature of the arrangement wasn't disclosed, then yes. Did you allege that, as opposed to, this is an unlicensed insurer? Yes, both. How much did your client pay for the premium? I would have to look, Your Honor. I do not know. It is a good idea, when you come arguing a case, to know the record. I understand and I apologize, Your Honor. Thank you very much. Thank you. Could you tell me which of you are arguing for whom and why we need more than one lawyer in this relatively simple case, if we're going to have more than one lawyer? Yes, Your Honor. My name is Lawrence Boras. I am appearing for Vicentian Buckley, the broker, as well as Patty Risk Purchasing Group, Inc. There are, in fact, four lawyers here. We have allocated approximately three and a half minutes for each of us, but I'm more than happy to try to answer all of the questions that you have on behalf of all of us, because it is a relatively simple case. I suppose I should do what I tell all the young lawyers in my office to do, is I'm really here just to answer questions. Can you help us, then, on some of the questions that we've asked, for example? Absolutely. I mean, how did this work? I assume Patty was named as the primary named insured, and then the dive shops are all named as additional insureds on the policy. That's exactly right, and there's an endorsement to the policy that says that everybody who gets a certificate, it actually says that, is an additional named insured under the policy. And Lexington was provided, to answer one of the other questions, Lexington was provided, I believe, quarterly, with the name of everybody who received a certificate. So actually, at any point in time, Lexington, in fact, knew precisely who was insured under the policy. How did the $300,000 work? The three? I'm sorry. How did it work, the $300,000? One of the other questions that was asked, getting to that answer, was approximately how much did Kauai pay? Kauai SCUBA, that year, paid approximately, I think it was $1,002 for its property coverage. They also paid an amount for their liability coverage, which is absolutely not at issue in this case. Before I forget... Did they also get that policy through Patty, or was that a... Yes, they did. It was an entire package. That's a different policy. It's a... With no SIR. Well, it's a different section, for sure. Of the master policy. Of this master policy, that's exactly right. So there's a first property coverage part, of which Kauai paid approximately $1,002, and then there was a liability part. The $300,000 was funded. It was a rated policy, so that each year there was first a nominal premium that was put on, and then depending upon how many dive shops decided to participate in the program, and then there was an analysis done of the risks that were done by actuaries, or whoever. And then when an insured pays $1,000, in this case, approximately $330 of that went into a pre-funded account, so that at the beginning... Is this in the record any place? I'm sorry? Is this in the record any place? I don't believe it is in the record at all. I'm answering Your Honor's questions, but I do not believe that any of this is in the record. The only thing I saw was a fleeting word saying funded. Can I ask a question, though, about, and I agree with that, going back to what is in the record, the allegations and the fleetings? Yes. Help me understand whether what the district court was analyzing was an allegation that at its core depended on the premise that Patty was an unlicensed insurer, and that's what the policy provided, and how much of the fleetings instead were a broader claim, a more expansive claim of there's this self-insured retention that should have been disclosed? I think in order to understand Judge Carter's order, I think you first have to go back and even look at the First Amendment complaint. When the same issues were present and the same allegations were present, if you go back and look, it starts off with, in fact, the appellant's brief here starts off with Patty is an unlicensed insurer. They shouldn't have done what they did. This program is all unlawful, and we were told we were getting coverage from Lexington, and we didn't get coverage from Lexington. That's how their brief starts off? That's how the First Amendment complaint starts off? It seems to me that it doesn't take a lot of tweaking. You can take out the word, you know, unlicensed insurer, but their basic complaint, even as you just described it, is we thought Lexington was going to pay our claims, and actually up to $300,000, Patty paid the claims. Whether you call Patty an unlicensed insurer or a non-insurer or whatever you call them, they're not Lexington, and they're not a licensed insurer, right? I mean, that was their basic complaint. So if we thought that was the problem here, they could amend their complaint in 30 seconds to fix that. Well, I think, first of all, Judge Carter, what I was trying to get to, as a district court judge, what he said after the First Amendment complaint is, look, what you've alleged so far is not adequate, and he did them the favor. He said, here is how your pleading is inadequate. He basically gave them a road map of, look, if you've got something here, you've got to put it out, and you've got to tell me. I'm a district court judge. You've got to allege precisely why you have standing, how you've been damaged, why this isn't barred by this case, why this isn't barred by this case. Now they file a Second Amendment complaint, and as Judge Carter pointed out, they didn't do what he basically told them to do, is give me all of the who, what, where's, and why's, and why you've been damaged, and how you've been damaged, and please just put that out. If you say that you didn't think you were going to get a $300,000 or you think there was a whatever, put it in the pleading. Put it in the record so that we all know precisely what's there and we can analyze it, and they didn't do that. That wasn't Judge Carter's fault. They didn't do what they did. The first question that your Honor's asked was about standing. It's absolutely true. Why are we here? These people haven't suffered any damage. I will tell you something else that's not in the record. No Patty Dive Shop ever had any problem with this program. I mean, I don't really know why we're here other than a theoretical discussion of pleading requirements, which Judge Carter, I think, analyzed quite adequately. They didn't plead it accurately. There's no damage. These folks for their $1,002 premium got paid $88,000, which by the way, they didn't say, you know what, don't take it back, which they were more than happy to take their $88,000 in loss for this insurance that they had. The temerity to allege in their first pleading was worthless and illusory. Does the record show whether they were ever told, did they get a copy of the master policy? I don't know precisely the answer to that. I believe that all the dive shops got was a certificate that says, here's a policy, here's your shop, here's the amount of coverage you have. Here is your particular deductible. You, individual dive shop, have a $1,000 deductible. You have, in this case, I think he had $48,000 of contents coverage. He was paid every penny of it. So that is, that's what they got. I don't believe they got a copy of the entire- So essentially what they got was proof that the insurance was binding. Proof that they were insured. You, Kawhi Scuba, are insured. You have $1,000. Don't worry about it. Go. And in fact, that's exactly what happened. They have a fire loss and they get their $88,000. And there's no allegation in the complaint that they could have procured insurance from some other source that would have provided the same amount of coverage at lower cost? The only thing that in the second amended complaint at Judge Carter's request, they changed an allegation from it's entirely illusory and worthless coverage to we overpaid for this coverage. But there is no allegation precisely about there is another policy that's out there. It provides exactly the same. It would have cost less. I paid $1,002. I could have gotten that one for $900. So their theory is I wouldn't have paid as much as $1,002 had I known of this ephemeral status to use it charitably to their allegations. I suppose that that's their theory. My understanding, and you can tell me if I'm right, is that this $300 retention is not in the policy anymore. That's right. This is all ancient history. As of 2010. That's a perspective to worry about. And it wouldn't be anyway because it's all in this representation claim and now they know. So. It's all ancient history. He doesn't own the shop anymore. Excuse me. Okay. I said he and that was the person that owned Kawhi Scuba when there was a fire. He no longer has that shop. In a sense, this is all moot. That policy doesn't exist anymore. This was a program that worked from 2005 through 2010. It worked magnificently. All these dive shops were able to get affordable coverage. Well, there's nothing inherently illegal about a self-insured retention. Of course not. Well, the only thing that I wondered about, but he really hasn't focused on it so I don't know what the answer is, is there any agreement between Patty and the shops that Patty is going to pay the retention? Suppose Patty didn't pay the retention. Well, I actually know. First of all, I don't represent that Patty. I represent Patty Risk Purchasing, which I need to, because it's the first line in my notes here. There's no allegation that Patty Risk Purchasing did anything. They were involved years ago with getting liability coverage. They're not involved. And of course, that's one other thing. You know, this idea of he defined all these different Pattys and so on. But, so I don't represent Patty. I should just leave it at that. I should just leave it at that. Among the other three of you, is anybody else trying to argue? Wanting to argue? Thinks they're supposed to be arguing? All right, go ahead. If you have any other questions, I mean, I do know how the program works. I am more than happy to tell you what's in the record, what's not in the record, if you have any other questions. Thank you very much. Thank you very much. Yes, go ahead. Good morning. My name is Pete Wasedich, and I represent Patty Worldwide and Patty Americas. And just to answer your question, there was no agreement between Patty and any of the shops to provide any sort of insurance. I think- I'm not talking about providing insurance. I'm talking about the retention. Suppose Patty didn't pay for one of the shops. Would the shop have done anything about it? Well, that's- Patty would not pay that. It was already funded. And that was what Mr. Boreas was talking about earlier when he was saying it was a rated policy. Who has the fund? The insurer already has it. It's already been funded. So it's funded out of a portion of the $1,002 premium. So Lexington has it. Yeah, a portion of the premiums went to fund the $300,000. So Lexington does pay it. Yes. So there's nothing to disclose. No, there's nothing to disclose. What's the check to the shop written by Lexington? I wouldn't know that. Yeah. Then you better disclose yourself, counsel, because we want to know who you are. It takes a village. Hey, please. Gordon Calhoun on behalf of York Insurance Services. York is the TPA that comes on after the fact when a claim actually occurs. So you write the checks? We write the checks. And in this case- You disclose the claim and write the check? Is that what you do? That's correct. Whether it's funded by Patty or whether it's funded by Lexington, either way? It really makes no difference. The funds come into York in some sum from Lexington, and then the monies are paid out. In this case, they happen to be paid. So I don't really understand. I mean, none of this is in the record, which is a little bit of a problem, but it appears that, in fact, a portion of the premium is going to Lexington for the purpose of sitting in a fund to pay these retentions. That's my understanding. So it's a reserve, in essence, against which the self-insured retention would be satisfied? In the vernacular, yes. In the insurance terminology, it's not a reserve. No, I understand, because it's not insurance. Thank you, Your Honor. Are we done? I think so. Thank you very much. I would advise all of you next time to see if you can get together a little better. I have nothing further. So unless the Court has any questions, I thank you for your time. Thank you. Thank you all. Okay, last case of the day, Hawaii Scuba Center v. Patty Americas, Inc., etc., is submitted.
judges: Rosenthal, Berzon, Tallman